**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————————

|  |  |  |
|---|---|---|
| | ) | |
| **HELEN SETTERLUND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **05-40194-FDS** |
| **JOHN POTTER, Postmaster General,** | ) | |
| **United States Postal Service,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

———————————————————————

**MEMORANDUM AND ORDER ON DEFENDANT'S SECOND MOTION FOR**
**SUMMARY JUDGMENT AND RENEWED MOTION TO STRIKE**

**SAYLOR, J.**

This is an action alleging sexual harassment, retaliation, and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Plaintiff Helen Setterlund, a female postal employee, alleges that she was subjected to a harassing and hostile work environment at a United States Postal Service facility in Worcester. The substance of Setterlund's complaint is that she was subjected to harassment by one or more co-workers and that her employer failed to take corrective action.

Defendant John Potter, the Postmaster General of the United States Postal Service, has moved for summary judgment in his favor. For the reasons described below, the motion will be granted in part and denied in part.

**I.      Factual Background**

Plaintiff Helen Setterlund began employment with the United States Postal Service as a letter carrier in 1987. After a back injury, she became a custodian for the USPS, first in

Shrewsbury and then (in 1996) at a facility in Worcester.  She was assigned to the Worcester facility until she left USPS employment in February 2006.

Jack Platt, Ben Wrubel, and Frank McGinn were also custodians at the facility.  Kenneth Fairbrother was the maintenance manager, supervising the custodians, from approximately 1991 to 2003.  Bernadette Syppko has been the maintenance manager since December 2003.  Stephen Rosetti has been the Postmaster since 2003.[1]

In October 1997, Setterlund signed an affidavit in support of a complaint by Deborah Flagg, a fellow female employee, to the Massachusetts Commission Against Discrimination.  The affidavit stated that she had witnessed Platt sexually harassing Flagg.  The matter was ultimately dismissed and Platt was not disciplined.

In early 1998, Setterlund herself filed a complaint with the Equal Employment Opportunity Commission reporting harassing and intimidating behavior by Platt.  She reported to the EEOC counselor that Platt referred to her and a co-worker as "fucking broads"; that he "talks loudly to other employees about how he is going to 'get'" various female maintenance employees; that the employees "come to work fearful of our lives because [Platt] owns guns and has said so"; that "[t]his hostile environment has been going on for over three years"; and that she and others had complained to various supervisors and union officials, and the situation had not been remedied.[2]

In May 1998, at the request of USPS management, a private company named Compass Comprehensive Assessment and Consultation performed an evaluation of the facility's

---

[1] Rosetti had worked at the Worcester facility on and off prior to becoming the Postmaster.

[2] [The resolution of the complaint is not set forth in the record].

2

maintenance department.  Compass concluded that an unnamed individual (who Setterlund

contends was Platt) was "a serious deterrent to the functioning of the department."  It reported

that almost all the employees disliked this individual and avoided contact with him if possible, and

that while he was merely annoying to the men, "many of the female staff experience their

interactions with this individual as intimidating and threatening.  Some report that he has stalked

them, glares at them, eyes them down when they are working, refers to them in sexually

derogatory terms . . . ."  (*Id.*).  The report made some written suggestions as to how to deal with

the situation.  The recommendations, however, were never implemented.

On April According to Setterlund, in June 1998 Platt followed her out of the facility and across the

street to where her husband was parked, waiting to pick her up from work.  She told her

supervisor about the incident and said that she felt threatened.  Platt also complained to

management about the incident; he contended that Setterlund's husband was waiting for Platt in

order to threaten *him*.  As a result, a supervisor ordered both Setterlund and Platt to stay away

from each other.  Setterlund complained later that month that Platt had been hanging around her

working areas on at least three occasions after being told to stay away from her.

On July 9, 1998, Setterlund went to the Ambulatory Psychiatry Services Department at

UMass Memorial Health Care Center, where she was diagnosed with acute stress disorder.  Her

nurse wrote a note to the USPS excusing her from work for the next several days.  On July 14,

her nurse wrote another note to the USPS, stating that Setterlund would be out of work

indefinitely for needed therapy and other treatment.

Also in July, 1998, Setterlund filed another complaint with the EEOC.  That complaint,

although presumably about Platt, is not part of the record before the Court.

In August 1998, the USPS offered Platt a different work assignment that supervisors thought he would accept in order to separate him from Setterlund.  Platt, however, refused the offer.

In September 1998, Setterlund withdrew her pending EEOC complaint in exchange for an agreement by USPS to provide her with a safe and harassment-free workplace.  The agreement was signed by a supervisor at the USPS facility.

It appears that no further incidents occurred for about a year and a half.  However, problems with Platt began again in March 2000.  That month, Setterlund contacted the Worcester Police Department about his threatening behavior.  On March 17, 2000, she wrote a letter to her supervisor requesting a change of schedule because Platt frequently waited by the time clock for her to punch out.  She alleged that Platt's behavior (including glaring at Setterlund and following her out of the building) during these encounters made her fearful for her life.  On March 20, she submitted a formal "Temporary Schedule Change" request, which was denied.  On April 14, she requested a transfer to a different USPS facility.  That request was also denied.

Throughout 2000 and 2001, Setterlund occasionally complained of threatening behavior by Platt, including staring, glaring, and stalking behavior.  In May 2001, she filed another complaint with the EEOC about Platt.

On January 17, 2002, Setterlund reported to her supervisor that Platt had verbally threatened her that morning (by saying that he was going to "get her").  She made two more reports of harassing behavior in January 2002, and two more in early 2003.[3]  In February 2003,

---

[3] The gap between the reports suggest that there was a lull in incidents for some time, and that the problems resumed in early 2003.

Setterlund again requested a transfer to another USPS facility.  That request was also denied.

On April 25, 2003, Setterlund reported that Wrubel had been operating a forklift in a dangerous manner.  At 9:20 a.m. on April 28, a supervisor reprimanded Wrubel for the incident.  Wrubel responded by telling the supervisor that he planned to get back at Setterlund for reporting him.  That same day, Setterlund reported to the same supervisor that she had found animal feces in her locker.[4]

Later in April, in response to a rumor that Setterlund was transferring to another facility, McGinn remarked to another co-worker that this was good news, because he wanted to "get rid of her anyway."

On May 5, 2003, Setterlund went to see a doctor due to the stress and anxiety she was feeling after finding the feces in her locker.  She was prescribed medication to help with the anxiety.  On May 8, she filed another EEOC complaint.

Between May 5 and 16, 2003, Setterlund reported to her supervisors that the toilets in the restrooms she was assigned to clean were clogged with mounds of toilet paper, with feces on top of the toilet paper.  Later in May 2003, Setterlund reported another encounter with Platt at the time-clock in which he stared at her in a threatening way.

Also in May 2003, the local postmaster conducted an investigation of the feces-in-locker incident, but was unable to determine the culprit.  He instructed a supervisor to monitor closely the interaction between the employees, and asked the Manager of Human Resources to address

---

[4] It is unclear at what time Setterlund found the feces in her locker.  The supervisor report says that she reported the finding to him (and showed him the bag of feces) at 10:00 a.m.  Setterlund's own documentation says she found the feces at 11:10 a.m.  Ann Conroy's documentation of the event says that Setterlund showed her the feces, before going to her supervisor, at 11:00 a.m.

the employees about harassing behavior.

On May 21, 2003, Setterlund reported that she thought that Wrubel mumbled "cunt, cunt" to her as she passed by him at work. Wrubel denied making the remark when questioned by a supervisor. Nothing further was done regarding this allegation.

The same day, Setterlund had a follow-up appointment with her physician regarding her anxiety medication. She also saw the physician for additional tests and treatment on May 22 and 28. The physician wrote a series of notes indicating she should stay out of work, eventually (in July) ordering her to remain out of work until further notice.

Setterlund had further medical and psychiatrist visits on August 28, September 15, September 30, and November 25, 2003. Although she seemed to be improving, attempts to reduce the dosage on her anxiety and depression medication were unsuccessful and she remained out of work. On January 6, 2004, her nurse and psychiatrist sent a letter to USPS stating that she was under their care for post-traumatic stress disorder, panic disorder, and depression stemming from harassment by co-workers and that she would be out of work until further notice. Her physician sent a similar note to the USPS on January 20, 2004.

Also on January 20, Setterlund was evaluated by a psychiatrist in connection with her application for worker's compensation benefits. In a letter to the Department of Labor, the psychiatrist stated that if the information Setterlund told him was accurate, she should not return to work because it was an unsafe environment.

Setterlund was seen by physicians on multiple occasions between February and July 2004. Each time, the recommendation was to continue medication and refrain from returning to work.

In May 2004, Setterlund was evaluated by a vocational rehabilitation consultant upon

6

referral from the USPS.  The consultant recommended that she be transferred to a different

facility.  In September 2004, she was evaluated by a psychiatrist chosen by USPS, who expressed

doubt that her anxiety and depression were work-related, and suggested a gradual re-integration

into work.

In October 2004, Setterlund resumed work on a part-time basis.

In December 2004, McGinn, who was the union steward, began investigating where

Setterlund parked her car.[5]  He discovered that although she had her supervisor's permission to

park in a special lot, she did not have the (needed) Postmaster's permission, and therefore had to

park in the off-site garage.

At the suggestion of the Employment Assistance Program, Setterlund sent a letter to the

Postal Inspection Service saying that she felt unsafe at work because of McGinn, Wrubel, and

Platt.  Also in December 2004, she met with two USPS supervisors, who said that she should

return to work full-time.  In response to her complaint about rude comments from McGinn, a

supervisor told her and McGinn to stay away from each other.

Between November 2004 and January 2005, Setterlund contends that other suspicious and

harassing (but anonymous) behavior was directed at her.  She believes that once someone

intentionally let air out of one of her tires, and that once someone intentionally left water running

in a janitor's closet in an attempt to electrocute her.

In February 2005, Setterlund filed another EEOC complaint.  She then filed the complaint

in this case in October 2005.

---

[5] It is not disputed that part of McGinn's job as union steward was to ensure that employees were obeying certain rules.

In November and December 2005, Setterlund's physician and nurse wrote notes to the USPS explaining why she had been absent from work on a several specific days, and to recommended that she not work more than four hours per day.  Also in December, she filed another complaint with the EEOC.  Later that month, there was another incident of clogged toilets on her route; she contends that they were clogged with paper towels, indicating it was an intentional act.  USPS contends that it investigated reports of  frequent toilet clogging at the time and discovered that construction debris in the drain pipes was the source of the problem.

In February 2006, Setterlund's physician sent a note to the USPS excusing her absence for a few days.  In April, the physician sent another note stating that she was to remain out of work until further notice.  In May, she received a letter from the U.S. Office of Personnel Management notifying her that she had been found to be "disabled" due to post-traumatic stress disorder.  In October, her psychiatrist sent a letter to the USPS saying she would likely never return to work because the USPS had failed to accommodate her post-traumatic stress disorder.

## II.   **Procedural History**

Plaintiff filed the present action on October 27, 2005.  Her seven-count complaint alleged claims of (1) negligence; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; (4) intentional and negligent infliction of emotional distress and sexual harassment; (5) assault and battery; (6) violation of the Massachusetts Civil Rights Act and unlawful retaliation in violation of Title VII, 42 U.S.C. § 2000e; and (7) violation of Mass. Gen. Laws ch. 151B and sex discrimination in violation of Title VII.

On June 13, 2006, defendant filed a motion to dismiss the tort, contract, and state law discrimination claims pursuant to Fed. R. Civ. P. 12(b)(1) and (6).  In December 2006, the Court

granted the motion.

On January 3, 2008, defendant filed a motion for summary judgment on the three remaining federal law counts:  defendant's failure to remedy a hostile work environment (Count IV), Title VII retaliation (Count VI), and Title VII gender discrimination (Count VII).  Plaintiff filed a memorandum in opposition to defendant's motion, to which she attached several dozen exhibits, including (among other things) letters, affidavits of co-workers, medical records, and USPS records.  Defendant moved to strike several of plaintiff's exhibits as inadmissible due to lack of authentication or because they consisted solely of hearsay.

On September 30, 2008, the Court issued an order conditionally granting the motion to strike unless plaintiff provided proof of authentication.  The Court also denied, without prejudice to its renewal, defendant's motion for summary judgment.  On November 5, plaintiff submitted affidavits and certifications in an effort to authenticate the disputed exhibits.  Defendant has submitted a renewed motion for summary judgment and a renewed motion to strike.

## III.   The Motion to Strike

### A.   Unsworn Witness Statements

Plaintiff has submitted at least six exhibits in the form of witness statements or letters, generally addressed "to whom it may concern."  None of the six statements are in the form of affidavits, and none have been sworn to by the relevant witness.  A party opposing summary judgment is not required to depose his own witnesses; affidavits for that purpose are permitted under the rule.  *Celotex*, 477 U.S. at 323.  However, plaintiff has pointed to no case, and the Court has found none, where an unsworn witness statement (as opposed to a deposition or affidavit) was accepted by a court in opposition to a motion for summary judgment.  The exhibits

9

to which defendant has renewed his objections are as follows:

Exhibit 5 is a statement by Norman Jackson, a co-worker, written "To Whom It May Concern," stating that he saw Platt waiting by the time clock for plaintiff.  Plaintiff submitted a certification that Jackson handed her the document on or about June 16, 1998.

Exhibit 22 is a statement by Dennis Cardwell,  a co-worker, written "To Whom It May Concern," stating that he heard McGinn say (in response to rumors that Setterlund was going to transfer to another facility) that he wanted to get rid of her anyway.[6]  Plaintiff submitted a certification that Cardwell handed her the document on or about April 30, 2003.

Exhibit 34 is a letter by Rita Gibbons, a co-worker, written "To Whom It May Concern," stating that she too had been threatened and harassed by Wrubel.  Plaintiff submitted a certification that Gibbons handed her the document on or about July 14, 2003.

Exhibit 54 is a handwritten note by Norman Jackson stating that he heard McGinn say he would bid for Setterlund's job just to "screw" with her.  Plaintiff submitted a certification that Jackson handed her the document on or about June 16, 1998.

Exhibit 56 is a statement by Deborah Elliot, a co-worker, describing a December 2004 meeting involving herself, plaintiff, and two supervisors, including comments made by McGinn. Plaintiff submitted a certification that Elliot handed her the document on or about December 21, 2004.

Exhibit 57 is a handwritten letter by Susan Landriana, a USPS employee, written "To Whom It May Concern," stating that in her short time in the department, she is already keenly

---

[6]  Attached to the statement is an affidavit of Cardwell containing a substantially similar statement.  That affidavit is in proper form and will be accepted.

aware that there is outward hostility and discrimination against female custodial and clerical staff.

Plaintiff submitted a certification that Landriana handed her the document on or about March 3,

2005.

The various certifications filed by plaintiff do not transform the statements into sworn

affidavits.  Furthermore, there is no evidence that defendant ever had possession of any of the

documents or notice or knowledge of their contents.  Exhibits 5, 22, 34, 54, 56, and 57 will

therefore be struck.

### B.    Other Exhibits

Exhibit 2 is a written statement signed by Setterlund.  At the bottom of the copy submitted

to the Court, Setterlund has written, "Statement Given to E.E.O. Counselor Susan Hanson."  It

appears that the statement was made in March 1998 when she filed a complaint about Platt.

Although the authentication of the document was not made by sworn affidavit, the Court will

overlook the defect for present purposes.  The contents of the statement, however, are hearsay,

and cannot be taken for their truth; they may, however, be used as evidence of notice or

knowledge.  Exhibit 2 therefore will not be struck.

Exhibit 3 is a "Comprehensive Assessment and Consultation" report prepared by

Compass.  Plaintiff's counsel certified that the document was produced by defendant in response

to a request for production of documents.  Again, the authentication was not made by affidavit,

but the Court will overlook the defect.  The document is hearsay and may not be considered for

its truth, but may be considered as evidence of notice or knowledge.  Exhibit 3 therefore will not

be struck.

Exhibit 4 is a document written by plaintiff "to whom it may concern" dated June 16,

11

1998.   Exhibit 11 is a letter from plaintiff to Kenneth Fairbrother dated March 17, 2000.   Exhibit

16 is a document addressed to "Ron" from plaintiff dated January 17, 2002.   Exhibits 24 and 27

consist of handwritten notes.   Plaintiff has made no effort to authenticate these documents, they

are not self-authenticating. and there is no evidence that defendant was aware of their existence or

contents.   Exhibits 4, 11, 16, 24, and 27 will therefore be struck.

Exhibit 25 is page 7 of a 13-page "Investigative Summary."   Plaintiff's counsel certified

that this document was produced by the defendant in discovery.   Again, although the certification

was not made by affidavit, the Court will overlook the defect.   Its contents are hearsay, but the

document may be considered as evidence of notice and knowledge.   Exhibit 25 therefore will not

be struck.

Exhibit 43 is a psychiatric evaluation of Setterlund dated January 20, 2004.   Plaintiff's

counsel certified that this document was produced by the defendant in discovery.   Again, although

the certification was not made by affidavit, the document may be considered on summary

judgment as evidence of notice and knowledge.   Exhibit 43 therefore will not be struck.

Exhibit 50 consists of a letter from Philip Candilis, M.D., dated September 5, 2004.   Dr.

Candilis certified that the records were authentic pursuant to Mass. Gen. Laws ch. 233, § 79G.

For purposes of summary judgment, the Court will accept the authentication, and the letter may

be considered as evidence of notice and knowledge.   Exhibit 50 therefore will not be struck.

Exhibit 59 is an affidavit of co-worker Ann Conroy, apparently prepared in connection

with an EEOC proceeding.   Plaintiff has not attempted to authenticate the document, and it does

not appear to be self-authenticating.   Exhibit 59 therefore will be struck.

Exhibit 66 is a letter from the United States Office of Personnel Management to plaintiff

dated May 1, 2006.  Plaintiff's counsel certified that the document was produced by defendant in response to a request for production of documents.  Again, the authentication was not made by affidavit, but the Court will overlook the defect for present purposes.  To the extent the document is offered for its truth, it appears to be a record of a regularly-conducted activity under Fed. R. Evid. 803(6), or an admission of a party-opponent under Fed. R. Evid. 801(d)(2).  Exhibit 66 therefore will not be struck.

Exhibit 78 is a largely typed document with no title; some of the words are cut off. Plaintiff's counsel certified that this document was produced by the defendant in discovery.  It is unclear what the document is, or even how it is relevant.  Exhibit 78 therefore will be struck.  **IV.**

### **The Motion for Summary Judgment**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990).  For the foregoing reasons, defendant's motion will be granted in part and denied in part.

### A.   **Count IV: Hostile Work Environment Due to Sexual Harassment**

Plaintiff contends that defendant is liable for the hostile work environment created by her co-workers because defendant had knowledge of the problem and failed to correct it.  Defendant contends that any harassment of plaintiff by her co-workers was not gender-based (and thus did not violate Title VII) and that it appropriately addressed her complaints of harassing behavior.

13

Employers are forbidden under Title VII from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment, Title VII is violated."  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

To succeed in a hostile workplace environment claim under Title VII, plaintiff must prove

> (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her membership of the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of her employment and created an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the [plaintiff] in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*Torres-Negron v. Merck & Co.*, 488 F.3d 34, 39 (1st Cir. 2007).

### 1.      **Membership in a Protected Class**

It is undisputed that plaintiff is a female, and that women are a protected class within the meaning of the statute.

### 2.      **Unwelcome Harassment**

Plaintiff has produced substantial evidence of unwelcome harassment by Platt, including both threatening and obnoxious behavior.  In addition to harassment clearly attributable to Platt, it is undisputed that in April 2003, someone placed a bag of animal feces in plaintiff's locker. Plaintiff also has produced other evidence of harassing behavior, such as evidence that someone

intentionally clogged toilets on her custodial route.

### 3.     Harassment Due to Membership in a Protected Class

Plaintiff contends that Platt and others used sexually offensive and derogatory terms towards her, and that there was an undertone of sexual harassment that permeated the work environment at the facility that emboldened her harassers.  Defendant contends that Platt's behavior towards plaintiff was not motivated by sexual desire or gender bias, but rather by a desire to get back at her for testifying against him in a fellow employee's MCAD proceeding. Defendant further argues that because the perpetrator(s) of the feces-in-locker incident are unknown, their motivation cannot be assumed to be gender-based.

Plaintiff does not contend that Platt or any other male employee touched her inappropriately or propositioned her for sexual acts.  However, it is still possible to find sexual harassment even where there is no propositioning, offensive touching, or sexual innuendo.  *See Billings v. Town of Grafton*, 515 F.3d 39, 48 (1st Cir. 2008).  Harassing conduct need not be motivated by sexual desire in order to legally qualify as sexual harassment.  *Id.* at 51.

Setterlund complained on multiple occasions that Platt stared at her or at female co-workers, and complained about them.  Furthermore, Kenneth Fairbrother, a USPS supervisor, testified in his deposition that he heard (from plaintiff, Conroy, and other employees) reports of Platt and others making sexually derogatory statements to and about plaintiff, including use of the term "eye fucking" to describe why he stared at plaintiff.  Fairbrother also stated that the department had a long history of verbal name-calling that could be characterized as sexual in nature, and that when he received complaints of name-calling he often did not investigate because history taught him that the alleged speaker always denied saying what was heard, and thus

15

investigating was a waste of time.

Although there is also evidence in the record to support defendant's contention that the offensive behavior (by Platt and others) directed at plaintiff was motivated by a desire to retaliate against her, plaintiff has submitted sufficient evidence to enable a reasonable jury to find that at least some of the hostile acts were motivated by gender bias and discrimination, and therefore to survive summary judgment as to that issue.

### 4.    Severe and Pervasive Harassment

To determine if an environment is severe and pervasive enough to be hostile due to sexual harassment, the court must examine all the circumstances. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).   The "severity" prong is satisfied only if the act is physically threatening or humiliating, rather than a merely offensive utterance. *See Harris*, 510 U.S. at 23.  "Pervasive" means more than occasional. *Id.*  However, a single incident, if serious enough, can be the basis for a finding of a hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Defendant contends that Platt's behavior was not severe or pervasive enough to create a legally cognizable hostile work environment.  "[T]he everyday observation of fellow employees in the workplace is . . . a natural and unavoidable occurrence when people work together in close quarters." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1248 (11th Cir. 1999).  Plaintiff responds that Platt's actions were more than mere observation, and included acts of stalking-type behavior. She also points out that Platt had been instructed to stay away from her, so his conduct could not be characterized as a "natural and unavoidable occurrence."

The "totality-of-the-circumstances" test mandates that district courts consider harassment

16

by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a
hostile work environment.  *See Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir.
1999).  The court should not conduct a separate hostile environment analysis for each potential
harasser.  *Id.*  Thus, although the perpetrator of the toilet and locker incidents were never
identified, these incidents can be considered in evaluating whether plaintiff experienced a hostile
environment.  Likewise, Wrubel's acts can be considered as additional incidents in the overall
hostile environment that plaintiff contends existed against women at the facility.  *See Billings*, 515
F.3d at 51.

The harassment by Platt occurred over a period of at least eight years.  Defendant argues
that there were breaks of months at a time where Platt did not bother plaintiff, and thus the
harassment was not consistent enough to be pervasive.  According to plaintiff, however, she never
knew from one day to the next when he would begin bothering her again.  Moreover, the Court is
required to examine the broader picture, and not place undue emphasis on specific individual
events.  *See Williams*, 187 F.3d at 563.  A claim can survive summary judgment if a reasonable
juror could find that the sum of all the incidents constitutes a hostile environment, even if any
individual incident alone would not be sufficient.  *Id.*  Here, plaintiff has submitted sufficient
evidence to enable a reasonable jury to so conclude.  Although the harassment was intermittent, it
occurred over an extended period of time, and thus satisfies the "severity" requirement.

5.      **Objectively and Subjectively Offensive**

It is not disputed that plaintiff subjectively found her work environment to be hostile and offensive.  Whether the plaintiff was subject to an objectively hostile work environment is a question of fact.  *See Billings*, 515 F.3d at 47.  The objective severity of the harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.  *Id.* at 47-48.  Here, there is sufficient evidence from which a reasonable juror could conclude that the conduct was objectively offensive, in that it could be reasonably viewed as threatening, offensive, and harassing.  Thus, plaintiff has submitted enough evidence for a reasonable jury to find that her work environment was both subjectively and objectively hostile.

6.      **Basis for Employer Liability**

"An employer's liability for a hostile work environment claim depends on the harasser's employment status relative to the victims."  *See Torres-Negron v. Merck & Co.*, 488 F.3d 34, 40 (1st Cir. 2007).  The employer may be vicariously liable if plaintiff's supervisor was one of the harassers creating the hostile work environment.  *Id.*  "To establish employer liability for a non-supervisory co-employee, a plaintiff must demonstrate that the employer knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action."  *See Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 401 (1st Cir. 2002).

Defendant does not appear to dispute that it had knowledge that plaintiff had been the victim of harassing behavior by Platt and others.[7]  Indeed, as early as her March 1998 EEOC statement, plaintiff stated that Platt had been harassing her for three years, that she had reported

---

[7] As noted, defendant does not concede that the behavior was sufficient to create a legally cognizable hostile work environment or rise to the level of sexual harassment.

this to her supervisors on numerous occasions, and that the behavior had not stopped.

Defendant, however, contends that it took prompt action after receiving complaints, including (1) ordering Platt to stay away from plaintiff, (2) investigating the toilet clogging and locker incidents, (3) confronting Wrubel about the mumbling incident, (4) having someone come in to talk to the department about harassing behavior, and (5) hiring workplace environment consultants.  Fairbrother also testified in his deposition that he disciplined Platt.

Plaintiff contends that while defendant sometimes took prompt action as the result of a complaint, management did not follow through, and therefore whatever action it did take cannot be deemed "appropriate."  For example, plaintiff contends (1) that investigations into the toilet clogging and locker incidents yielded no conclusive results, and no one was ultimately punished; (2) the instruction to Platt to stay out of her work area and away from her was not enforced by management; and (3) that the recommendations of Compass were never implemented.  Similarly, in his deposition, Fairbrother recalled that there were occasional recommendations of changes that should be made in the maintenance department to help alleviate whatever hostile and harassing environment that existed, but he never remembers implementing or being told to implement any of them.  Plaintiff also contends that defendant could have done more; for example, her requests for a schedule change or transfer to another USPS facility (to avoid Platt) were denied.

Under the circumstances, plaintiff has submitted sufficient evidence from which a reasonable jury could find that defendant knew or should have known of the hostile work environment and that it did not take prompt and appropriate action to remedy the situation. Accordingly, and because plaintiff has submitted evidence as to each element of the claim, the motion for summary judgment will be denied with respect to Count IV.

19

### B.   Count VI:  Title VII Retaliation

The anti-retaliation provisions are generally directed at the conduct of employers, not co-employees.  However, employers may not ignore retaliatory acts by employees.  "Just as an employer will be liable for discrimination if it tolerates a racially or sexually hostile work environment, it will be liable for retaliation if it tolerates severe or pervasive harassment motivated by the plaintiff's protected conduct."  *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 26 (1st Cir. 2002).

In order to make out a prima facie case of retaliation, plaintiff must prove that "(1) she engaged in protected conduct under Title VII; (2) she suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity."  *See id.* at 22.

### 1.   Protected Conduct

The protected conduct at issue here consists of plaintiff's complaints about sexual harassment in the workplace (including verbal and written complaints to her supervisors), her participation in Flagg's MCAD suit against Platt, and her filing of various EEOC complaints.

### 2.   Adverse Employment Action

In the complaint, plaintiff alleges that USPS took adverse employment action against her by subjecting her to different terms of employment, such as being timed in the restroom, being required to undergo a fitness for duty examination, and not being given the contractually guaranteed five days to decide whether to accept a route.  However, there is no evidence in the record regarding any of these incidents, and plaintiff does not mention them in her memorandum in opposition to summary judgment.

Instead, plaintiff now contends that her working conditions became so intolerable that she

was constructively discharged.  In order to prove constructive discharge, a plaintiff must "show that her working conditions were so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign."  *Lee-Crespo v. Schering-Plough del Caribe, Inc.*, 354 F.3d 34, 45 (1st Cir. 2003).  Her subjective perception does not govern.  *Id.*; *see Marrero*, 304 F.3d at 28.  Plaintiff stopped coming to work in February 2006, on medical advice, and officially resigned in October 2006.  The temporal distance between her resignation and the last acts of alleged retaliatory harassment casts significant doubt on the connection between the two.  *See Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991).  However, starting in May 2003, she was periodically out of work due to what she contends is post-traumatic stress disorder resulting from the hostile environment she experienced at work.  Under the circumstances, a factfinder might reasonably conclude that her resignation was in fact causally related to the harassment.

### 3.   Causal Connection Between Protected Activity and Adverse Employment Action

The claim of retaliation has substantially less evidentiary support than the claim of a hostile work environment.  For example, there is no apparent basis on which plaintiff can tie the locker incident (which plaintiff alleges was perpetrated by Wrubel in order to retaliate for reporting his unsafe operation of a forklift truck) to her protected conduct under Title VII.  In other words, plaintiff may have engaged in commendable activity by reporting the incident, but it was not the type of activity protected by Title VII.  Similarly, there is no apparent basis to tie the alleged harassment by McGinn concerning her parking place to Title VII protected conduct.

Nonetheless, plaintiff has submitted evidence suggesting that the hostile work environment she experienced was motivated by a desire to retaliate against her for her filing of her various

complaints.  Plaintiff filed a series of EEOC complaints making allegations about Platt; Platt

continued to harass her, and the USPS took no effective action.  Furthermore, although plaintiff

experienced harassment from Platt prior to signing the 1997 affidavit in the MCAD suit, she

contends that the severity and pervasiveness of the harassment increased significantly as a result

of her participation in the MCAD case.  Platt was also overheard saying that he would get back at

those who had participated in the MCAD suit against him.  Thus, plaintiff contends that Platt's

harassment of her was in retaliation for her protected activity of participating in the suit, and that

defendant tolerated that behavior.

Plaintiff appears to have offered sufficient evidence for a reasonable jury to find that she

suffered an adverse employment action in retaliation for engaging in a protected activity.  Thus,

for the above reasons, defendant's motion for summary judgment will be denied as to Count VI.

### C.   Count VII:  Title VII Sexual Discrimination by the USPS

Plaintiff also contends that defendant's failure to respond to her complaints constituted

disparate treatment on the basis of gender.  To succeed on a differential treatment claim, the

plaintiff must show that similarly situated males were treated more favorably, and that she was

treated differently because of her gender.  *See Rivas Rosado v. Radio Shack, Inc.*, 312 F.3d 532,

534 (1st Cir. 2002); *Duncan v. General Motors Corp.*, 300 F.3d 928, 933 (8th Cir. 2002); *Oncale

v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998).

In her complaint, plaintiff alleged that she was more closely scrutinized because she is a

woman.  She alleged that her breaks were closely timed and that she was required to undergo a

fitness-for-duty examination, and that male employees were not.  However, there is no evidence in

the record regarding these incidents, and plaintiff does not mention them in her memorandum in

opposition to summary judgment.  Plaintiff's only current complaint about defendant's behavior is that it did not take action to remedy the hostile and harassing work environment created by her co-workers.

Again, to succeed on this claim, plaintiff has the burden to establish that there were one or more similarly situated male employees who received more favorable treatment than she did.  *See Perkins v. Brigham & Women's Hospital*, 78 F.3d 747, 751 (1st Cir. 1996).  Plaintiff has not even attempted any such showing here.  Accordingly, defendant's motion for summary judgment will be granted with respect to Count VII.

## V.    Conclusion

For the foregoing reasons,

Defendant's renewed motion to strike is GRANTED in part and DENIED in part. Exhibits 4, 5, 11, 16, 22, 24, 27, 34, 54, 56, 57, 59, and 78 are hereby struck.

Defendant's second motion for summary judgment is GRANTED as to the claim of Title VII sexual discrimination (Count VII), and otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: August 7, 2009